**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2002 SEP 11 P 2: 24

CLERK'S OFFICE
AT BALTIMORE
_____ DEPUTY

|   |   |   |
|---|---|---|
| HALE TRUCKS OF MARYLAND, LLC | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-00-2028 |
| | : | |
| VOLVO TRUCKS NORTH AMERICA, INC. | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM**

Now pending before this court are motions and a cross-motion
for summary judgment pursuant to Fed.R.Civ.P. 56 brought by each
of the parties remaining in the case. This case involves
disputes that arose out of a truck dealership agreement between
Volvo Trucks North America, Inc. ("VTNA") and Hale Trucks of
Maryland, LLC ("Hale Trucks") that established Hale Trucks as a
dealer of Volvo trucks. Also involved in this litigation are
financing agreements between Hale Trucks and Volvo Commercial
Finance, LLC The Americas ("VCF").[1] In order to partially
finance its operations, Hale Trucks established various credit
facilities with VCF. After the business relationships between
the Volvo entities and Hale Trucks deteriorated, VCF declared its

---

[1] VTNA is a corporation organized under Delaware law, with
its principal place of business in Greensboro, North Carolina,
and Hale Trucks is a limited liability company organized under
Maryland law, with its principal place of business in Baltimore,
Maryland.  VCF is a limited liability company organized under
Delaware law with its principal place of business in Greensboro,
North Carolina.  Hale Trucks is a Maryland Limited Liability
Company.

loans to Hale Trucks to be in default, and VTNA terminated the
Dealership Agreement with Hale Trucks.

Multiple claims and counterclaims are now pending before
this court. Arguments by counsel were heard on July 19, 2002.
For the reasons set forth below, all motions except for VTNA's
motion on its counterclaim will be granted.

## I.   **BACKGROUND**

### A.   **Edwin Hale, Sr. Becomes a Volvo Truck Dealer**

Edwin Hale, Sr., has been in the trucking business since
1974. (VTNA Mot. for Summ. J., Ex. 1 at T01412.) According to
VTNA, after a sales call from VTNA in 1995 or 1996, Mr. Hale
expressed interest in becoming a Volvo dealer himself. (Id. at
Ex. 3 at 14-16.) Hale Trucks asserts that Edward H. Brown, then
an executive at VTNA, lobbied Mr. Hale for several years to
become a Volvo dealer. (Hale Trucks Opp. to VTNA Mot. for Summ.
J. at 2.) Rather than initially acquiring a Volvo Truck
dealership, first Mr. Hale acquired a Peterbilt Truck dealership
in July of 1997, which was incorporated as Peterbilt of Central
Maryland, LLC. (VTNA Mot. for Summ. J., Ex. 1 at T01412-13.)
According to Mr. Hale, Brown actively assisted him in acquiring
the Peterbilt franchise. (Hale Trucks Opp. to VTNA Mot. for
Summ. J., Ex. 1 at 23-24.)

In 1998 Mr. Hale agreed to pay VTNA $800,000 for the rights

2

to operate a Volvo truck dealership in Baltimore, $400,000 in
"equity investment" and $400,000 in the form of a "forgivable
loan." (VTNA Mot. for Summ. J., Ex. 1 at T01412).  VTNA asserts
that it was agreed the $400,000 payment was to be made from Mr.
Hale's personal assets.  (Id., Ex. 1 at T01412, Ex. 11 at T00012,
00007.)  Mr. Hale agrees that a $400,000 payment was to be made
pursuant to the contract, but contends that there was no
restriction upon the source of the funds.  (Hale Trucks Opp. to
VTNA Mot. for Summ. J. at 3-4.)

Prior to Mr. Hale ultimately being granted the dealership,
on November 18, 1998 he executed a "Portfolio of Criteria" (the
"Portfolio") that laid out the minimum responsibilities of Hale
as a potential Volvo truck dealer.  (VTNA Mot. for Summ. J., Ex.
1 at T01430-41.)  The purpose of the Portfolio was to notify the
dealer applicants of the "minimum standards necessary to provide
both an adequate representation of [VTNA] and a meaningful profit
opportunity to the dealer."  (Id., Ex. 1 at T01430.)   The
Portfolio covered topics such as initial capital and working
capital requirements, sales targets, profit projections,
personnel requirements, and minimum inventory of new, unsold
trucks.  (Id., Ex. 1 at T01430-41.)  It indicated that the
business would be operated as "Hale Volvo Trucks of Maryland
LLC," and was signed by Mr. Hale at the fifteen points required
by the form.  (Id.)  According to Mr. Hale's testimony, he did

3

not understand that the Portfolio prescribed any requirements for the proposed dealership. (Id., Ex. 2 at 52.) Hale Trucks argues that the Portfolio did not constitute a contract between it and VTNA because of its preliminary nature, and that the Portfolio contemplated further negotiation regarding the proposed relationship between Mr. Hale, Hale Trucks and VTNA. (Hale Trucks Opp. to VTNA Mot. for Summ. J. at 5-6.)

Mr. Hale also submitted to VTNA an "Application for Authorized Dealer Sales and Service Agreement," (VTNA Mot. for Summ. J., Ex. 10), and an "Applicant's Source of Funds Statement." (Id., Ex. 11.) In the application, Mr. Hale represented that he was prepared to invest more than $1,000,000 in the dealership. (Id., Ex. 10 at T00010.) In the Source of Funds statement, Mr. Hale represented that he planned to use personal funds to fund an ownership interest in the dealership. (Id., Ex. 11 at T00012.) Mr. Hale also testified that he did not read the Source of Funds Statement before he signed it, (Id., Ex. 2 at 46-47), and having read it at some point later on, he admitted in deposition that it prohibited him from paying the $400,000 due to VTNA with borrowed funds. (Id. at 49.)

On January 4, 1999, a "Dealer Sales and Service Agreement" (the "Dealer Agreement") was executed between Hale Trucks, which Mr. Hale had by then formed, and VTNA. (Id., Ex. 9.) Because the $400,000 payment due at closing was not available from Mr.

4

Hale or Hale Trucks, VTNA lent Hale Trucks the $400,000 for a term of four days and proceeded to execute the agreement. (Id., Ex. 13.) Brown, who by that time had left the employ of VTNA, signed the Dealer Agreement on behalf of Hale Trucks in his new capacity as President. (Id., Ex. 9 at T00082.) The Dealer Agreement specified that Hale Trucks must perform in compliance with the terms set forth in the Portfolio, (Id., at T00061), and also set forth specific requirements regarding minimum net working capital. (Id. at T00084-85.)

After the Dealer Agreement was executed, Hale Trucks went about acquiring new financing. On January 8, 1999, Hale Trucks established a $700,000 line of credit with VCF. (Id., Ex. 16.) It is undisputed that Hale Trucks drew $700,000 from the line of credit, and used $400,000 to repay the four-day loan extended by VTNA. On January 13, 1999, Hale Trucks entered into a $3,000,000 "Floor Plan Financing Agreement" with VCF to finance the purchase of new trucks. (VTNA Mot. for Summ. J., Ex. 19.) According to the testimony of a VTNA employee, VTNA has no role in arranging financing for its dealers, either through VCF or any other lender. (Id., Ex. 18 at 41-42.)

## B. **Hale Trucks' Operations and Financial Difficulties**

VTNA alleges that when the new dealership opened, Hale Trucks was almost immediately in breach of the Dealer Agreement

5

by virtue of its filing misleading and incorrect financial
statements. The Dealer Agreement required periodic financial
reporting to VTNA. (Id., Ex. 9 at T00068.) Until March 2000,
Hale Trucks listed the $700,000 loan as paid in capital. (Id.,
Ex. 20 at Hale 002490.) Furthermore, the operating statements
failed to show the $700,000 as a liability. (Id.) Hale Trucks
does not dispute these allegations, but instead claims that its
technique of financial reporting was standard practice within the
truck sales industry. (Hale Trucks Opp. to VTNA Mot. for Summ.
J. at 10.) Hale Trucks also argues that its reporting was proper
because VTNA was not actually misled. (Id.)

In early 1999, Hale Trucks and VTNA agreed to expand Hale
Trucks' geographic area of responsibility. (VTNA Mot. for Summ.
J., Ex. 23, Ex. 17 at 14-16.) VTNA agreed to expand Hale Trucks'
"Area of Responsibility" from its original Maryland territory, to
include portions of New Jersey, Delaware, and Pennsylvania.
(Id.) The expansion, however, was contingent upon Hale Trucks
developing a facility in southern New Jersey or Delaware within
twelve months. Hale Trucks never developed such a facility.
(Id.)

According to Hale Trucks, part of the reason the new
facility was never developed was because Brown directed his
energies toward developing his own New Jersey Volvo dealership,
instead of working to establish a Hale Trucks facility. (Hale

6

Trucks Opp. to VTNA Mot. for Summ. J. at 11-13.)  Hale Trucks
alleges that Brown, along with another prominent figure in the
New Jersey trucking industry, made plans to open his own
dealership in southern New Jersey.  (Id. at 11.)  Similarly, Hale
Trucks alleges that "VTNA knew Brown was looking to open his own
dealership in New Jersey, but cynically did nothing to inform
Hale Trucks' owner that Brown was actively working to undermine
the dealership's expansion into New Jersey."  (Id. at 13.)  Brown
acknowledges that he took steps to acquire his own Volvo
dealership, but claims that his plans were to acquire a
dealership outside of Hale Trucks' territory.  (Brown Mot. for
Summ. J. at 3.)  Furthermore, his plans to acquire a dealership
never came to fruition, and thus he never actually competed with
Hale Trucks on any level.  (Id., Ex. A at ¶ 11.)

     Although the first three quarters of 1999 were successful
for Hale Trucks, it began to develop cash flow difficulties in
the fourth quarter. (VTNA Mot. for Summ. J. at 10.)  The
dealership had ordered more than 300 Peterbilt trucks, and was
receiving them faster than it could sell them.  (Id.)  VTNA
alleges that the cash flow problems were exacerbated by Edwin
Hale, Sr. taking approximately $450,000 out of Hale Trucks to
invest in his barge business, (Id. at 10-11.), as well as by
daily cash transfers among Mr. Hale's various businesses,
including the Volvo dealership.  (Id. at 11.)  According to the

7

testimony of Mr. Harry Lipsitz, the chief financial officer of Hale Trucks, Edwin Hale, Sr.'s businesses would often pay each others' bills, only to reconcile the inter-company transfers on a monthly basis. (Id., Ex. 4 at 28-49.) Furthermore, Lipsitz testified that Hale Trucks would file federal excise tax returns on truck sales, but without the required payment, (Id., Ex. 4 at 194-97), and would cut checks to its floor plan financiers, but not send them and use the money for other purposes. (Id., Ex. 4 at 176-78.) During this period, Hale Trucks also encountered difficulties with VCF. (Id. at 11-12.) Because of at least one bounced check and weak financial reporting, VCF temporarily suspended its floor financing plan. (Id.)

According to Hale Trucks, VTNA exaggerates the extent of the difficulties encountered in 1999. Hale Trucks admits that it fell behind on its payments to its other floor plan lender, Associates Commercial Finance Corporation ("Associates Commercial"). (Hale Trucks Opp. to VTNA Mot. for Summ. J. at 13.) It claims, however, that there was no $450,000 payment from Hale Trucks to another Hale entity, and that there is no evidence the chief financial officer "would use money generated by the sales of trucks for purposes other than paying VCF on their floor plan," (Id. at 13-14), and that the "bounced" check was in fact caused by a mistake by Hale Trucks' bank. (Id.)

8

### C. **Deterioration of the Relationship Between Hale Trucks and the Volvo Entities**

During 2000, the relationship between VTNA and Hale Trucks began to seriously deteriorate. Effective January 1, 2000, Hale Trucks of Maryland, LLC was merged with Peterbilt of Central Maryland, LLC, with the surviving entity named Hale Truck Centers, LLC. (VTNA Mot. for Summ. J. at 12, Ex. 87.) According to VTNA, the annual financial report of the consolidated entity for the period ending January 31, 2000 was misleading as it continued to show the $700,000 loan as paid-in capital and it failed to reflect a liability for the same amount. (Id. at 12, Ex. 29, Ex. 14.) In February 2000 an audit by Associates Commercial revealed that Hale Trucks was "out-of-trust" with Associates Commercial more than $800,000.[2] (Id. at 12-13, Ex. 30 at T00150.) Because of these and other mounting difficulties, Brown arranged for a meeting with VTNA executives Sam Johnston, Director of Dealer Development and Distribution, and Jack Yarbrough, Controller of Dealer Operations. (Id. at 13.) According to Johnston's testimony and an email written by Yarbrough memorializing the meeting, several important facts were discovered at the meeting, including the existence of large operating losses; the diversion of funds to Mr. Hale's trucking business; the out-of-trust situation with Associates Commercial;

---

[2] A floor plan borrower is "out-of-trust" when it fails to use the proceeds of a sale to pay down the floor plan loan.

9

federal excise tax arrears of $62,918; an inability to pay VTNA
$200,000 then due; a net working capital of negative $518,000; a
lack of reserves for aged receivables, parts or used truck
inventory; and a failure to collect open work orders. (Id. at
13-14, Ex. 30 at T00149-51, Ex. 31 at 19-20.) At this point VTNA
still was not aware of the mis-accounting of the $700,000 loan,
which was not properly reflected until Hale Trucks submitted its
operating statement for the period ending March 31, 2000. (Id.
at 14, Ex. 32.) At the meeting, "either Brown or Lipsitz gave
[VTNA] permission to advise VCF that Hale Trucks was out-of-trust
with Associates Commercial." (Id. at 14, Ex. 31 at 18.) On
February 16, 2000, Johnston and Yarbrough also met with Edwin
Hale, Sr., who stated that he expected to be able to recapitalize
Hale Trucks through the refinancing of other assets he
controlled. (Id. at 14, Ex. 7 at 22-23.)

Hale Trucks does not dispute any of the alleged facts
collected by Johnston and Yarbrough during their visit.
According to Hale Trucks, however, Brown was not permitted to
disclose certain facts to VTNA or to VCF, particularly that Hale
Trucks was out-of-trust with Associates Commercial. (Hale Trucks
Opp. to VTNA Mot. for Summ. J. at 15.) Hale Trucks alleges
further that Brown, in an effort to drum up interest in
developing his own southern New Jersey Volvo dealership,
wrongfully disclosed this same information to important customers

10

of Hale Trucks.  (Id. at 15-16.)

Also in February 2000, VCF became more concerned about its
exposure with Hale Trucks.  VTNA's Johnston had notified VCF
about Hale Trucks' out-of-trust situation with Associates
Commercial.  (VTNA Mot. for Summ. J. at 14, Ex. 31 at 20.)  In
conversations with VCF personnel, Brown indicated that new
financing was in the works and would be completed by Mid-March.
(Id., Ex. 38.)  On February 22, Brown informed VCF that
Associates Commercial had reinstated the floor financing plan
that had been previously suspended, and that certain overdue
payments to VTNA had been renegotiated.  (Id., Ex. 39.)  On
February 28, 2000, a team of VCF personnel met with Hale Trucks
to "get a better understanding of the situation."  (Id. at 16-17,
Ex. 40 at 60-62.)  According to VTNA, "[u]nfortunately, at that
meeting, VCF discovered that Hale Volvo and Hale Peterbilt had
merged at the end of 1999.  While Peterbilt, Associates
Commercial and [VTNA] had been notified of the merger, VCF had
not."  (Id. at 17; see also Ex. 4 at 220.)  Upon learning of the
merger, VCF became concerned that it was no longer adequately
secured and that its collateral had become threatened by the
merger, because Associates Commercial possibly had a first lien
on Hale Trucks' receivables.  (Id., Ex. 4 at 221-23, Ex. 31 at
20-21; Ex. 40 at 46.)  Because of these concerns, VTNA agreed to
directly invoice Hale Trucks' customers in order to prevent Hale

11

Trucks from going out-of-trust with VCF.  (Id., Ex. 43.)

## D.  **Hale Trucks Defaults with VCF**

On March 6, 2000, VCF declared Hale Trucks to be in default
of the Floor Plan Financing Agreement and the Revolving Credit
Loan Agreement.  (Id., Ex. 41.)  The default was declared because
of cross-default provisions that were triggered by the out-of-
trust situation with Associates Commercial, and because the
merger of Hale Trucks and Peterbilt of Central Maryland into Hale
Truck Centers was conducted without the consent of VCF.  (Id.)
VCF demanded payment of all monies due by March 20, 2000.  (Id.)
VTNA states that it was not pleased with VCF's decision to
default Hale Trucks, since it considered Hale Trucks to be an
"outstanding dealer."  (Id. at 18, Ex. 31 at 44-45.)

On March 8, 2000, Hale Trucks rejected a proposed
forbearance agreement presented by VCF, and presented a new
proposal of its own.  (Id. at 19, Ex. 51.)  Negotiations were not
immediately concluded, and by March 20, VCF was not paid the
balance due on its loans.  (Id. at 19, Ex. 57.)  Negotiations
continued, and all issues appeared to be resolved except for the
interest rate on the $700,000 revolving line of credit.  (Id.,
Ex. 60.)  On April 10, VCF refused to negotiate further, stating
that the interest rate was non-negotiable and that Hale Trucks
had until April 14 to accept the proposed forbearance agreement

12

as it then stood.  (Id., Ex. 62.)  Hale Trucks did not accept the
proposed agreement, and it thus remained in default.

**E.   VTNA's Reaction to Hale Trucks' Financial Difficulties**

In reaction to Hale Trucks' financial difficulties, in
February and March 2000, VTNA claims that it began to devise a
plan to partially recapitalize the business.  (Id., Ex. 34, Ex.
35, Ex. 36, Ex. 37; Hale Trucks Opp. to VTNA Mot. for Summ. J.,
Ex. 2 at 35-36.)  One and one-half million dollars were to be
extended to Hale Trucks as a "working capital loan," on the
condition that it cease sales of Peterbilt Trucks.  (VTNA Mot.
for Summ. J, Ex. 34.)  VCF personnel then presented the plan to
Edwin Hale, Sr.  According to Mr. Hale, the offer was only for
1.2 million dollars.  (Id., Ex. 2 at 73-74.)  The parties
disagree whether this was an attempt by VTNA to assist Hale
Trucks, or instead an attempt to take advantage of the situation
by eliminating the Peterbilt competition.  (Id. at 14-15; Hale
Trucks Opp. to VTNA Mot. for Summ. J. at 18-19.)  Regardless of
VTNA's motivations, Hale Trucks refused the offer.

**F.   VCF Moves to Foreclose on Hale Trucks**

On April 20, 2000, VCF "confirmed" that its line of credit
to Hale Trucks had become unsecured.  (VTNA Mot. for Summ. J. at
21, Ex. 63.)  Within five days, Mr. Shannon of VCF noted in an

13

email that Hale Trucks had a negative working capital of $500,000, no cash flow, and a negative net worth. (Id., Ex. 64.) VCF, however, decided to delay action and review Hale Trucks' financial forecasts because of VTNA's desire to keep Hale Trucks in business. (Id., Ex. 65.) By May 3, 2000, because of Hale Trucks' continuing problems and the failure of Edwin Hale, Sr. to recapitalize the business, VCF and VTNA agreed that it was time to proceed "in due course" against Hale Trucks. (Id., Ex. 66.)

On May 12, 2000, Edward Brown and Chris Patterson of VTNA met in Philadelphia. During the meeting, Brown told Patterson that he had learned from chief financial officer Lipsitz that there was insufficient cash for a $200,000 obligation due to VTNA, and that a check made out to VTNA in that amount would not clear when it was presented for payment. (Id., Ex. 3 at 193-202.) Patterson relayed this information to VCF, stating in an email that "the course of action VCF committed to pursue last week seems inevitable." (Id., Ex. 68.) This presumably refers to an earlier decision by VCF to foreclose on Hale Trucks and repossess its secured collateral. Hale Trucks claims that Brown's statement was a deliberate misrepresentation intended to harm Hale Trucks, and in fact no $200,000 payment was due on May 12, 2000. (Hale Trucks Opp. to Brown Mot. for Summ. J. at 19-20.)

According to VTNA, "Patterson's e-mail appears to have

14

triggered a decision by VCF not to delay repossessing its truck collateral." (VTNA Mot. for Summ. J. at 23.)  On Saturday, May 13, VCF attempted to repossess its truck collateral located at Hale Trucks' facility.  (Id., Ex. 71 at 137.)  Brown turned away VCF, and instructed the VCF representatives to return on Monday, May 15.  (Id.)

## G.   **Failure to Terminate the Dealer Agreement on Mutually Satisfactory Terms**

Beginning on May 15, 2000, Hale Trucks and VTNA began negotiations to terminate the Dealer Agreement on mutually satisfactory terms.  (Id. at 24-25.)  These negotiations failed, and on May 26, 2000, VTNA advised Hale Trucks that the loss of floor plan financing on May 15, 2000 placed it in violation of the Dealer Agreement, and that Hale Trucks had until June 16, 2000 (30 days from the date of the loss) to obtain new financing.  (Id., Ex. 76.)  Because Hale Trucks failed to acquire new financing that met the terms of the Dealer Agreement and had no trucks on its showroom floor, VTNA canceled the Dealer Agreement on June 23, 2000.  (Id., Ex. 77, Ex. 78, Ex. 79.)

## H.   **The Current Litigation**

Hale Trucks brought a multi-count complaint against VTNA and VCF in the Circuit Court for Baltimore City, which was removed to this court pursuant to 28 U.S.C. § 1332.  VTNA and VCF both

15

raised multi-count counterclaims in their answers, some of which were brought against Edwin Hale, Sr., the owner of Hale Trucks and a citizen of Maryland. After answers and counterclaims were filed, on October 31, 2000 Hale Trucks was granted leave to amend its complaint, at which point it brought new claims against Edward H. Brown. On August 3, 2001, a joint stipulation of dismissal and Order dismissing with prejudice the claims between Hale Trucks and Edwin Hale, Sr., and VCF was entered by the court, thus releasing VCF from the case altogether.

Hale Trucks asserts ten counts in its Amended Complaint, nine of which are still in the case.[3]  Count I alleges a breach of the Dealer Agreement against VTNA, Count III alleges a civil conspiracy between VTNA and VCF to "improperly terminate" the Dealer Agreement, Count IV alleges a civil conspiracy among VTNA, VCF, and Edward Brown to "improperly terminate" the Dealer Agreement, Count V alleges a breach of the duty of loyalty by Edward Brown, Count VI alleges that VTNA tortiously interfered with the employment relationship between Hale Trucks and Edward Brown, and caused Brown to breach his duty of loyalty to Hale Trucks, Count VII alleges a breach of Brown's fiduciary duties to Hale Trucks, Count VIII alleges that VTNA tortiously interfered with Hale Trucks' economic relations by causing Edward Brown to

---

[3] Count II was asserted only against VCF, which was dismissed from the case.

16

breach his fiduciary duties to Hale Trucks, Count IX alleges
against VTNA a violation of MD. CODE ANN. Transp. II, § 15-209,
and Count X alleges against VTNA a violation of MD. CODE ANN.
Transp. II, § 15-207.  VTNA has moved for summary judgment on all
Counts except Count III.  Edward Brown has moved for summary
judgment on Counts IV, V, and VII.

In its answer, VTNA asserts four counterclaims.  Count I
alleges a breach of contract by Hale Trucks based on a failure to
repay the forgivable performance loan, Count II alleges a breach
of contract by Hale Trucks based on a failure to pay VTNA for
parts, literature, and other items that were delivered to Hale
Trucks, Count III alleges that Edwin Hale, Sr. and Hale Trucks
intentionally misrepresented that $400,000 of the funds due at
the execution of the Dealer Agreement would come from Edwin Hale,
Sr.'s personal funds, when in fact payment was made by way of
credit extended by VCF, and Count IV alleges the negligent
representation of the same facts as alleged in Count III.  VTNA
has moved for summary judgment on Count III, and Edwin Hale, Sr.
has cross-moved on Count III and has moved separately for summary
judgment on Count IV.

## II.  **ANALYSIS**

Rule 56(c) of the Federal Rules of Civil Procedure provides
that summary judgment

17

shall be rendered forthwith if the pleadings, depositions,
answers to interrogatories, and admissions on file, together
with the affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any
factual dispute will defeat the motion:

By its very terms, this standard provides that the mere
existence of some alleged factual dispute between the
parties will not defeat an otherwise properly supported
motion for summary judgment; the requirement is that
there be no genuine issue of material fact.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)
(emphasis in original).

"The non-moving party 'may not rest upon mere allegation or
denials of [its] pleading, but must set forth specific facts
showing that there is a genuine issue for trial.'" Hughes v.
Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995)(quoting Anderson, 477
U.S. at 256).   The court must "view the facts and draw
reasonable inferences in a light most favorable to the nonmoving
party," Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), but it
also must abide by its affirmative obligation to ensure that
factually unsupported claims and defenses do not proceed to
trial.   Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th
Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24
(1986)).

## A.   Hale Trucks' Claims Against VTNA and Edward Brown

18

1.   **Breach of Contract**

In its Amended Complaint, Hale Trucks alleges that VTNA's
termination of the Dealer Agreement was improper and thus
constituted a breach of that agreement.  (Am. Compl. ¶¶ 40-41.)
Hale Trucks claims that "[VTNA] has wrongfully terminated the
Dealership Agreement and attempted and/or has sold [Hale Trucks']
dealership to others."  (Id.)  Hale Trucks argues in its
opposition that it was not itself in breach of the Dealer
Agreement, and that if it was in breach, those breaches were
cured and VTNA's termination was thus wrongful.  (Hale Trucks
Opp. to VTNA Mot. for Summ. J. at 35-36.)  Because Hale Trucks
was in breach of the Dealer Agreement and failed to cure its
breach, summary judgment will be granted on Hale Trucks' contract
claim (Count I).[4]

In its motion for summary judgment, VTNA has pointed out

_____

    [4]   In its opposition, Hale Trucks made two other arguments.
First, Hale Trucks argued that it and VTNA had reached an
enforceable agreement to voluntarily terminate the Dealer
Agreement, and that this was the agreement that VTNA breached.
(Hale Trucks Opp. to VTNA Mot. for Summ. J. at 33-34.)  Counsel
for Hale Trucks clearly abandoned this position at oral argument.
Next, Hale Trucks argued that VTNA breached the Dealer Agreement
by failing to give reasonable notice, as required by the
agreement, before terminating the dealership.  (Id.)  The court
interprets statements made by Hale Trucks' counsel at oral
argument as indicating that this position was also being
abandoned.  In case there is a misunderstanding about counsel's
intent to abandon this second argument, the court finds no
material dispute that adequate and "reasonable" notice was given
by VTNA to Hale Trucks prior to the termination of the Dealer
Agreement.

19

numerous breaches of the Dealer Agreement that would have warranted termination. These breaches include an insufficient initial capital investment, the concealment of material facts in required operating reports, the failure to maintain adequate floor plan financing, and the failure to maintain an inventory of new Volvo trucks. (VTNA Mot. for Summ. J. at 30-35.) Under the Dealer Agreement, any one of these alleged breaches would have provided VTNA with a valid basis for termination of the Dealer Agreement. (Id. Ex. 9 at T00074-00077.) The Dealer Agreement expressly provides that VTNA may terminate the agreement upon the "[l]oss of an adequate wholesale credit line without implementing a satisfactory substitute within thirty (30) days." (Id. at T00075.) Similarly, the Dealer Agreement sets forth requirements for records and reports, (Id. at T00068-69), and provides that the failure of Hale Trucks to perform any material obligations under the agreement is a ground for termination. (Id. at T00074-75.) The capitalization requirements are set forth in the Portfolio, which is specifically incorporated into the Dealer Agreement. (Id. at T00061.)[5] VTNA, however, only relied upon one of these alleged breaches when it actually terminated the

---

[5] Hale Trucks argues throughout its briefs that the Portfolio does not constitute a contract between Hale Trucks and VTNA. This is incorrect. While the Portfolio itself may have constituted an agreement of a preliminary nature between Edwin Hale, Sr. and VTNA, it was specifically incorporated into the Dealer Agreement between Hale Trucks and VTNA. (Id. at T00061.)

Dealer Agreement: the failure to maintain adequate floor plan financing and an inventory of new Volvo trucks. (Id. Ex. 76.)

While there is obviously a dispute between Hale Trucks and VTNA over the interpretation of the Dealer Agreement, this does not necessarily preclude summary judgment. Where the language of a contract is unambiguous, summary judgment may be granted without resort to extrinsic evidence. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992). Once a court determines that a contract is unambiguous on a dispositive issue, "it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." Id.

Looking to the Dealer Agreement in this case, the court finds that the terms relied upon by VTNA in terminating the agreement are unambiguous, and that VTNA was within its rights to terminate the agreement. The Dealer Agreement specifically sets forth that it may be canceled upon "loss of an adequate wholesale credit line without implementing a satisfactory substitute within 30 days." (VTNA Mot. for Summ. J., Ex. 9 at T00075.) It is undisputed that Hale Trucks' floor plan (or "wholesale") financing was canceled, and that it was not restored within 30 days. Therefore, VTNA was within its rights to terminate the Dealer Agreement, as it did by letter on June 23, 2000. (Id. at Ex. 77)

21

Hale Trucks' argument that termination was improper because of Edwin Hale, Sr.'s investments after May 25, 2000 is without merit. Hale Trucks claims that Edwin Hale, Sr. invested $877,016 into the dealership between May 25 and June 2, 2000. (Hale Trucks Opp. to VTNA Mot. for Summ. J. at 35.) Yet, Hale Trucks can point to no term in the Dealer Agreement to support its argument that post-breach investments neutralize the breach and make termination unwarranted. Furthermore, Hale Trucks appears to argue that the investment would have cured any deficiencies in Hale Trucks' capital requirements as set forth in the Dealer Agreement and the Portfolio. Unfortunately for Hale Trucks, although VTNA effectively argued in its papers that Hale Trucks had breached the capital funding requirements, it did not rely on these deficiencies when it terminated the Dealer Agreement. Furthermore, Hale Trucks admits in its surreply that the investment (valued in its surreply at $752,000) was not to increase capital reserves, but instead was paid in by Edwin Hale, Sr. to resolve deficiencies with other Hale Trucks creditors. (Hale Trucks Surreply at 8.) Therefore, Edwin Hale, Sr.'s investments in May and June of 2000 have no relevance to the particular breach of the Dealer Agreement upon which VTNA based its termination.

For the foregoing reasons, VTNA's motion for summary judgment on the contract claim (Count I) will be granted.

## 2.   **Conspiracy to Terminate Hale Trucks as a VTNA Dealer**

In Count III of the Amended Complaint, Hale Trucks alleges a conspiracy between VCF and VTNA to terminate the Dealer Agreement. Although VCF is no longer in this case, Count III as against VTNA has not been dropped. Count IV alleges a conspiracy among Edward Brown, VCF, and VTNA, also to terminate the Dealer Agreement. VTNA has moved for summary judgment on Count IV. Because both Counts are based on the same operative facts, and VTNA's arguments apply equally to each alleged conspiracy, this court treats VTNA's motion as if it had moved for judgment on both Counts III and IV.

The gist of the alleged conspiracies is as follows. VTNA allegedly terminated the Dealer Agreement based on VCF's "wrongful" cancellation of Hale Trucks' financing agreements. (Id. at 12.) VCF canceled financing because of Edward Brown's "disclosures" and "false statements," which were intended to undermine Hale Trucks. (Id.) According to Hale Trucks, "Brown wanted to destabilize Hale Trucks in order to secure a VTNA dealership for himself (and others) in New Jersey." (Id.) VTNA knew this, and encouraged Brown in his "disclosures." (Id.)

Hale Trucks' claims fail for several reasons. First, Hale Trucks has provided no authority to demonstrate that Maryland recognizes "conspiracy to terminate a contract" as a cause of action. As recognized by the Maryland courts, civil conspiracy

23

is a product of the law of tort. Alleco Inc. v. Harry & Jeanette
Weinberg Foundation, Inc., 665 A.2d 1038, 1044-45 (Md. 1995).
Indeed, "'it is not a separate tort capable of independently
sustaining an award of damages in the absence of other tortious
injury to the plaintiff.'" Id. (quoting Alexander v. Evander,
650 A.2d 260, 265 n.8 (Md. 1994)). Put another way, "[c]ivil
conspiracy is a parasite tort - it cannot stand alone." Kramer
v. Mayor and City Council of Baltimore, 723 A.2d 529, 542 (Md.
App. 1999); see also Alleco, 665 A.2d 1038 at 1044-45. A civil
conspiracy to breach a contract is not a viable claim.

Second, regarding the relationship between VTNA and VCF, the
record is devoid of facts to suggest that there was an agreement
or understanding to terminate the Dealer Agreement. Such an
agreement is required. A civil conspiracy is "a combination of
two or more persons by an agreement or understanding to
accomplish an unlawful act or to use unlawful means to accomplish
an act not in itself illegal with the further requirement that
the act or the means employed must result in damages to the
plaintiff." Yousef v. Trustbank Sav. F.S.B., 568 A.2d 1134, 1139
(Md.App. 1990)(citations omitted). Instead of there being an
agreement or understanding to harm Hale Trucks, the record shows
that VTNA actively discouraged VCF from terminating the floor
plan financing arrangement because it believed, almost until the
very end, that Hale Trucks was a valuable dealership. (See VTNA

24

Mot. for. Summ. J., Ex. 47, Ex. 48, Ex. 31 at 44-45, Ex. 42 at
87-89.)  Thus, the evidence belies any likelihood that VTNA and
VCF had conspired to wrongfully terminate the Dealer Agreement.

Furthermore, the information traded back and forth between
VTNA and VCF was done so pursuant to explicit permission by Hale
Trucks.  Hale Trucks is particularly concerned about the
disclosure by VTNA to VCF of information from the February, 2000
meeting where the out-of-trust situation with Associates
Commercial was disclosed by Brown and Lipsitz.  VTNA and VCF,
however, were entirely justified in sharing between them
financial information on Hale Trucks.  In the Dealer Agreement,
Hale Trucks agreed that it "hereby grants to [VTNA] the right to
obtain directly from any of the Dealer's Truck or Parts financing
sources all financial information pertaining to the Dealer's
operations . . . and Dealer hereby expressly authorizes any such
financing source to release such information to [VTNA]."  (Id.
Ex. 9 at T0068.)  Similarly, there is no reason why VTNA should
not have been freely allowed to share with VCF information about
Hale Trucks' financial difficulties.  VTNA proffered undisputed
testimony that either Edward Brown or Harry Lipsitz gave explicit
permission for VTNA to share details of its financial situation
with VCF.  (Id., Ex. 31 at 17-18.)  Even if this is not true,
however, VTNA was not barred from sharing information with VCF.
The Dealer Agreement required that Hale Trucks retain adequate

25

wholesale financing, and VTNA cannot reasonably have been
expected to remain silent with information that would threaten
the financing plan that VTNA itself required.  Therefore, it was
entirely lawful for VCF and VTNA to share with each other
information concerning Hale Trucks.

Turning to Edward Brown, Hale Trucks argues that his alleged
breaches of his fiduciary duty owed to Hale Trucks led to the
declaration of default by VCF and to the termination of the
Dealer Agreement.  Hale Trucks alleges further that these acts
were committed as part of a conspiracy with VTNA and VCF.  If
Brown's actions were not tortious, there can be no civil
conspiracy arising out of those actions.  As discussed in section
II.A.2, Hale Trucks has failed to allege a cognizable tort claim
against Brown under the laws of Maryland.  This court cannot
recognize a conspiracy in the absence of an underlying tort.[6]

Summary judgment on Counts III and IV will therefore be
granted.

### 3. **Breach of Fiduciary Duties**

In Counts V and VII of the Complaint, Hale Trucks alleges
that Edward Brown, the President of Hale Trucks, breached the

---

[6] Even if the underlying tort necessary to prove a
conspiracy had been properly alleged, Hale Trucks has not
proffered any evidence of an agreement between Brown and VTNA or
VCF.

26

fiduciary duties he owed to it, including the duty of loyalty.
(Am. Comp. ¶¶ 58-62, 68-72.)  Brown has moved for summary
judgment on these counts.

In opposing Brown's motion, Hale Trucks argues that Brown
engaged in a systematic attempt to undermine Hale Trucks and
establish his own Volvo dealership in southern New Jersey.
Specifically, Hale Trucks first claims that Brown, in the course
of attempting to establish his own Volvo dealership, actively
solicited existing customers of Hale Trucks and disclosed
damaging information to Hale Trucks' customers.  (Hale Trucks
Opp. to Brown Mot. for Summ. J. at 13, 15-17.)  Second, Hale
Trucks alleges that Brown breached a duty to safeguard trade
secrets and confidential information.  (Id. at 14-15.)  While
Hale Trucks' argument does not specify what "trade secrets" and
"confidential information" were disclosed, this court assumes
from its reading of the background sections of Hale Trucks'
memorandum that it was the disclosure to VTNA of the out-of-trust
situation with Associates Commercial and the fact that Hale
Trucks had fallen behind on excise tax payments.  (Id. at 7.)
Hale Trucks finally argues that Brown intentionally harmed Hale
Trucks by merging the previously independent Hale Trucks and Hale
Peterbilt entities in violation of the VCF floor plan finance
agreement, and by falsely informing VTNA that a $200,000 check
was going to bounce when no such check existed and no $200,000

27

obligation was due.  (Id. at 15-17.)

As a corporate officer of Hale Trucks, Brown owed it certain fiduciary duties. One of these duties was that of loyalty; corporate officers and employees owe an undivided and unselfish loyalty to the corporation. Maryland Metals, Inc. v. Metzner, 382 A.2d 564, 567-68 (Md. 1978)(citing cases); cf. Insurance Co. of North America v. Miller, 765 A.2d 587, 597-99 (Md. 2001)(discussing fiduciary duties of agent). According to the Court of Appeals, "[W]e have read into every contract of employment an implied duty that an employee act solely for the benefit of his employer in all matters within the scope of employment, avoiding all conflicts between his duty to the employer and his own self-interest." Maryland Metals, 382 A.2d at 568. A corollary of the duty of loyalty is the principle that a high-ranking employee may not directly compete with his or her employer. Id. According to the Court of Appeals of Maryland, this requires that

> prior to his termination, an employee may not solicit
> for himself business which his position requires him to
> obtain for his employer. He must refrain from actively
> and directly competing with his employer for customers
> and employees, and must continue to exert his best
> efforts on behalf of his employer.

Id. After the termination of the employment relationship, the employee may go into direct competition with the former employer, "subject to certain restrictions concerning the misuse of his former employer's trade secrets and confidential information."

28

Id.

An employee may, however, make preparations to compete while in the service of his or her employer. Id. at 568-70. To require otherwise would stifle competition and make it exceedingly difficult for employees to move on to new positions, since it would be unlawful to make advance preparations. Thus, the "policy in favor of free competition has prompted the recognition of a privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty." Id. at 569; see also Planmatics, Inc. v. Showers, 137 F. Supp. 2d 616, 627 (D. Md. 2001).

The privilege to prepare to compete is lost, however, when the employee commits a "fraudulent, unfair, or wrongful act in the course of preparing to compete in the future." Id. "Examples of misconduct which will defeat the privilege are: misappropriation of trade secrets; misuse of confidential information; solicitation of employer's customers prior to cessation of employment; conspiracy to bring about mass resignation of employer's key employees; usurpation of business opportunity." Id. at 569-70 (internal citations omitted). In other words, the employee can plan to compete as long as those plans do not cause harm to the original employer.

29

Hale Trucks' three main arguments that Brown breached duties owed to it are analyzed below.

### a. **Brown's Plans to Become a Volvo Dealer in Competition with Hale Trucks**

Hale Trucks argues first that Brown's plans to become a Volvo dealer himself, and his disclosures made in connection with those plans, constituted a breach of his fiduciary duties. (Hale Trucks Opp. to Brown Mot. for Summ. J. at 13, 15-17.) The record reveals the following factual background relating to Brown's relationship with Hale Trucks. Brown was employed as President of Hale Trucks from January 1, 1999 to June 1, 2000. (Brown Mot. for Summ. J., Ex. A at ¶ 3.) Brown admits that, prior to the termination of his employment with Hale Trucks, he made attempts to acquire his own Volvo truck dealership. (Id. at 4.) From conversations that allegedly occurred during this time period between Brown, Harry Muhlschlegel (a principal of New Century Transportation), and Christopher Patterson of VTNA, Patterson inferred that Brown had decided to "cast his lot" with Muhlschlegel by planning to open or acquire a Volvo dealership with him. (Hale Trucks Opp. to Brown. Mot. for Summ. J., Ex. 7 at 21.) New Century Transportation was one of Hale Trucks' largest customers. (Id. at 3.) Brown maintains that the dealership he hoped to acquire was outside of Hale Trucks' exclusive territory. (Brown Mot. for Summ. J., Ex. A at ¶ 10.)

30

It is undisputed that before July 2000, Hale Trucks' Volvo territory included six counties in New Jersey: Camden, Atlantic, Cape May, Cumberland, Gloucester, and Salem.  (Id. at ¶ 7.) Documentary evidence in the form of recovered e-mails suggests that Brown was interested in acquiring Atlantic Truck Sales in Cinnaminson, New Jersey, which was indeed outside of Hale Trucks' territory.  (Hale Trucks Opp. to Brown Mot. for Summ. J., Ex. 8; Brown Mot. for Summ. J. at 4.)

As part of Brown's attempts to obtain a Volvo dealership, it is alleged that he disclosed to Hale Trucks' customers that it was out-of-trust with Associates Commercial and that it was delinquent in its federal excise tax payments.  These disclosures were allegedly made in order to undermine Hale Trucks and enhance Brown's own ability to open a dealership in southern New Jersey. (Hale Trucks Opp. to Brown Mot. for Summ. J. at 7, Ex. 12 at 94-95, Ex. 13 at 30-31.)  Matthew Hehl of New Century Transportation testified that Brown disclosed to him that Hale Trucks was out-of-trust with a creditor, and that Hale Trucks was not paying its federal excise tax.  (Id. Ex. 13 at 30-31.)  According to Hehl, these disclosures caused there to be "concern [for] the ongoing viability of the dealership that could potentially be the one that we would be purchasing the trucks from."  (Id. Ex. 13 at 30.)  Hehl testified that long-term viability of Hale Trucks was an issue since it was presumed that Hale Trucks would provide

31

service for the trucks it sold. (Id. at 30-31.) Brown admits that he disclosed the out-of-trust situation to New Century Transportation, but claims that the disclosure was a business necessity since it would have been impossible to deliver trucks without the floor plan financing in place. (Id. Ex. 12 at 94-95.)

Significantly, there is no evidence that Brown's disclosures ever caused Hale Trucks to lose business, and it is undisputed that Brown never acquired or opened a Volvo dealership anywhere. (Brown Mot. for Summ. J., Ex. F at 136-37.) Considering their preliminary nature, Brown's plans to become a Volvo truck dealer were not wrongful in and of themselves, regardless of where he expected the dealership to be located.

Hale Trucks nonetheless argues that Brown's disclosures to its customers were intended to cause it injury, and thereby constitute a breach of the duty of loyalty, regardless of their relation to Brown's plans to compete. (Hale Trucks Opp. to Brown Mot. for Summ. J. at 15-17.) The court finds, however, even assuming ill intent on behalf of Brown, that the alleged disclosures were not sufficiently material to have constituted a breach of the duty of loyalty. A breach of the duty of loyalty must be both willful and material for a principal to be entitled to remedies as against its agent. See Regal Sav. Bank, FSB v. Sachs, 722 A.2d 377, 380 (Md. 1999); see also, St. Paul at Chase

32

Corp. v. Manufacturers Life Ins. Co., 278 A.2d 12, 25 (Md. 1971);

Maryland Credit Fin. Corp. v. Hagerty, 139 A.2d 230, 234 (Md.

1958). Three factors influence the court's judgment that Brown's

alleged disclosures to Hale Trucks' customers were immaterial.

First, there is no evidence in the record that Hale Trucks

suffered any harm from the alleged disclosures. Although it is

possible that Brown's disclosures could have discouraged Hale

Trucks' existing customers sometime in the future, Hale Trucks

itself destroyed its relationship with VTNA well before that

became possible. Second, the disclosures were allegedly made as

part of the very early planning of Brown's own Volvo dealership.

Brown's plans were too speculative and preliminary to warrant an

inference that he would have been trying to harm Hale Trucks to

benefit himself through the alleged disclosures. Finally, the

information allegedly disclosed by Brown was in fact true, and

Brown's undisputed testimony is that there were legitimate

business reasons for Hale Trucks' customers to have the

information: because the loss of floor plan financing could have

complicated the delivery of new trucks. (Hale Trucks Opp. to

Brown Mot. for Summ. J., Ex. 12 at 94-95.) Therefore, regardless

of Brown's intent in making the alleged disclosures, these acts

do not warrant a finding that he breached a duty.

> b. **Disclosure of "Confidential Information" and
> "Trade Secrets" to VTNA**

In addition to the above-mentioned disclosures to Hale
Trucks' customers, Hale Trucks alleges that Brown disclosed
damaging information to VTNA and VCF. Hale Trucks argues that it
was wrongful for Brown to have disclosed to VTNA the out-of-trust
situation with Associates Commercial and the excise tax
arrearage. (See Hale Trucks Surreply at 12, "VCF only cancelled
its financing agreements after Brown's disclosures and false
statements . . . .")

Brown's disclosures of information to VTNA relating to the
out-of-trust situation and tax arrearages, however, were entirely
proper. Hale Trucks had an obligation, pursuant to the Dealer
Agreement, to make truthful disclosures regarding its financial
condition. (See VTNA Mot. for Summ. J., Ex. 9 at T00068-69.)
The Dealer Agreement provides that

> the Dealer shall maintain uniform accounting records in
> the manner prescribed by [VTNA], that at all times
> accurately reflect the financial condition of its
> business and by the fifteenth . . . day of each month,
> the Dealer shall furnish to [VTNA] a complete operating
> report covering its operation on a calendar year-to-
> date basis.

(Id. at T00068) Hale Trucks already had a contractual obligation
to VTNA to release the information that Brown disclosed.
Accordingly, these disclosures cannot be considered a breach of
fiduciary duty.

### c. Brown's Decision to Merge Hale Volvo Trucks

34

**of Maryland, LLC and Peterbilt of Central
Maryland, LLC, and his report of the $200,000
NSF Check**

Peterbilt of Central Maryland, LLC and Hale Trucks of
Maryland, LLC were merged effective January 1, 2000, the
surviving entity being Hale Trucks. (Id., Ex. 87.)  This merger
had negative consequences for Hale Trucks since difficulties from
the original Hale Peterbilt business caused the merged entity to
become out-of-trust with Associates Commercial a month after the
merger.  (Id. at 13, Ex. 30 at T00150.)  Furthermore, Hale Trucks
failed to inform VCF of the merger, thus bringing about an event
of default under the VCF floor plan financing agreement.  Hale
Trucks alleges that these negative consequences were exactly what
was intended when Brown "merged" the original Hale Peterbilt and
Hale Trucks.  According to Hale Trucks, "Brown informed the
owner, Edwin F. Hale, Sr., that the merger was a cost saving
measure.  However, the merger could only have had and did have
serious negative consequences for Hale Trucks."  (Hale Trucks
Opp. to Brown Mot. for Summ. J. at 5.)

This claim fails because of a complete lack of evidence.
Hale Trucks has proffered nothing to support its claim that Brown
wrongfully merged the two entities to intentionally bring about
their demise.  More important, as the sole member of the two
original LLCs, Edwin Hale, Sr. had the exclusive discretion and
power to merge the two entities.  See MD. CODE ANN., Corps. &

35

Ass'ns, § 4A-702 (2001). Though in retrospect the merger may have been ill-advised, Hale Trucks has not proffered evidence to prove that it was an unreasonable course of action at the time it occurred. Nor has any evidence been proffered to suggest that Brown had decision-making responsibility for the merger. The only document evidencing the transaction is an "Articles of Merger" signed by Edwin Hale, Sr. (VTNA Mot. for Summ. J., Ex. 87.)

Next, Hale Trucks alleges that Brown told VTNA that Hale Trucks had sent a check for $200,000 to VCF that would not clear when presented for payment. (Hale Trucks Opp. to Brown Mot. for Summ. J. at 10, Ex. 15.) According to an affidavit by Hale Trucks' chief financial officer, no such check ever existed and no payment was due. (Id., Ex. 11 at ¶ 6.) Internal VCF emails suggest this piece of information may have played a role in VCF's decision to repossess its collateral and terminate its business relationship with Hale Trucks. (Id., Ex. 15.)

Nonetheless, the facts in the record indicate that VCF had already begun the process of foreclosing on Hale Trucks. According to the evidence, upon finding out about the $200,000 check, Chris Patterson of VTNA wrote to VCF personnel suggesting "the course of action VCF committed to pursue last week seems inevitable at this juncture." (Id.) Thus, it appears that VCF had already decided on its course of action by the time it found

36

out about the $200,000 check. More importantly, and as discussed supra, Hale Trucks was already in serious breach of the Dealer Agreement by the time Brown supposedly discussed the check with VTNA personnel. Therefore, even if Brown willfully fabricated the information about the $200,000 check, it was not material. The disclosure was an insignificant causal factor with respect to the harm that Hale Trucks alleges.

For the reasons set forth above, summary judgment on Counts V and VII will be granted.

### 4.   **Tortious Interference with Business Relationship**

In Counts VI and VIII, Hale Trucks alleges that VTNA tortiously interfered with the employment relationship between Hale Trucks and Edward Brown by encouraging Brown to breach his fiduciary duties owed to Hale Trucks. Hale Trucks alleges that VTNA "tacitly endorsed Brown's solicitation of the owner of Hale Trucks' largest customer . . . ." (Hale Trucks Opp. to VTNA Mot. for Summ. J. at 37.) To prove such endorsement, Hale Trucks alleges that VTNA was aware of and encouraged Brown in his attempt to establish or acquire a Volvo dealership before he resigned from Hale Trucks. (Id. at 37-38.) According to the testimony of Matthew Hehl, a VTNA employee requested a business plan from him and Brown, and promised to support their efforts to establish a dealership. (Hale Trucks Opp. to Brown Mot. for

37

Summ. J., Ex. 13 at 33, 35, 38.) Even assuming the truth of Hehl's testimony and Hale Trucks' allegations, Hale Trucks has failed to allege facts that would support a claim of tortious interference with economic relationships.

Because Brown was an employee at will, Hale Trucks has pleaded the general intentional tort of interference with economic relationships, rather than the more specific tort of inducing the breach of an existing contract. See Alexander & Alexander, Inc. v. B. Dixon Evander & Assoc., Inc. 650 A.2d 260, 268 (Md. 1994). A claim of tortious interference with a business relationship arises out of the relationship between three parties: the two parties to the contract and the interferer. Mates v. North American Vaccine, Inc., 53 F. Supp. 2d 814, 827 (D. Md. 1999). The right of the third party to interfere is treated more permissively where there is no contract or a contract terminable at will. Id. at 827-28. The elements of interference with economic relationships are

(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

Alexander & Alexander, Inc., 650 A.2d at 268-69. As elucidated by the Court of Appeals,

wrongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from

38

> its effect on the plaintiff's business relationships.
> Wrongful or unlawful acts include common law torts and
> "' violence or intimidation, defamation, injurious
> falsehood or other fraud, violation of criminal law,
> and the institution or threat of groundless civil suits
> or criminal prosecutions in bad faith.'"

Id. at 271 (citations omitted).[7]

Hale Trucks' claim fails on several grounds. First, as
discussed supra, Brown never violated his fiduciary duties to
Hale Trucks. Second, even assuming he breached those duties,
Hale Trucks has failed to allege, much less proffer evidence that
could prove, the malice that would satisfy the "unlawful purpose"
element. Nor has Hale Trucks proffered evidence to prove that
VTNA intentionally attempted to harm Hale Trucks. Hale Trucks
has only proffered that VTNA knew of Brown's plans, and asked for
the submission of a business plan to determine if those plans
were feasible. In no way could this course of conduct be thought
of as "wrongful or unlawful" in and of itself.

Furthermore, there is no evidence that Brown's disclosures
resulted in any injury to Hale Trucks. Although Brown attempted
to establish a Volvo truck dealership in partnership with a large
customer of Hale Trucks, the proposed dealership never
materialized and there is no evidence that Hale Trucks lost sales
or good will because of Brown's actions. Because damage is an

---

[7] "' [A]ctual malice,' in the sense of ill will, hatred or
spite, may be sufficient to make an act of interference wrongful
where the defendant's malice is the primary factor that motivates
the interference." Id.

element of any tort, the lack of evidence demonstrating damages is an independent and sufficient reason that the wrongful interference claim fails.

For these reasons, Hale Trucks has failed to support its claim that VTNA interfered with the economic relationship between Hale Trucks and Edward Brown, and summary judgment will be granted on Counts VI and VIII.

## 5. Breach of § 15-209 and § 15-207 of the Maryland Transportation Article

Hale Trucks alleges against VTNA violations of the Maryland Transportation Article. Count IX alleges a breach of § 15-209, which sets limits on when a vehicle manufacturer may terminate the franchise of a dealer. Count X alleges a breach of § 15-207, which prohibits "coercion" of dealers by vehicle manufacturers and distributors. Both counts fail as a matter of law.

### a. **Section 15-209**

Section 15-209 of the Maryland Transportation Article sets forth in relevant part:

(b) <u>Distributors</u>. -- A distributor may not terminate, cancel, or fail to renew the franchise of a dealer, notwithstanding any term or provision of the franchise, unless:

(1) The dealer has failed to comply substantially with the reasonable requirements of the franchise; and

40

> (2) Except as otherwise provided by subsection (d)
> of this section, the distributor:
>
>> (i) Gives the dealer at least 90 days' prior
>> written notice of the termination,
>> cancellation, or nonrenewal and of the
>> specific grounds for the action; and
>>
>> (ii) Provides the Administration with a copy
>> of that notice.

MD. CODE ANN., Transp. II, § 15-209(b)(2001).   An exception to

the ninety-day period is provided in § 15-209(d)(1), which allows

cancellation upon fifteen days "if the ground for the

termination, cancellation, or nonrenewal is the dealer's

inability to reasonably serve the interests of the public."

Hale Trucks argues initially that it complied substantially

with the reasonable requirements of the Dealer Agreement, thus

rendering wrongful any attempt by VTNA to terminate the

agreement.   (Hale Trucks Opp. to VTNA Mot. for Summ. J. at 29-30;

Hale Trucks Surreply at 7-9.)   As discussed supra in section

II.A.1, however, there is no dispute that VTNA was justified in

terminating the Dealer Agreement.   Hale Trucks was in breach of

the Dealer Agreement by losing its wholesale financing and

failing to find a replacement within thirty days.

The remaining issue, therefore, is whether under § 15-209(d)

VTNA was justified to terminate the Dealer Agreement on fifteen

days' notice.   As explained below, at the time the notice of

cancellation was delivered, Hale Trucks was unable to serve the

public interest, and therefore the fifteen-day notice period was

41

appropriate.

Only two cases have construed the meaning of "interests of the public" as used in § 15-209(d)(1).[8]  In Annapolis Motors, Inc. v. Motor Vehicle Administration, [1980-83 Transfer Binder] Bus. Franchise Guide (CCH) Para 7831 at 13,151 (Md. Cir. Ct. 1982), Judge Frosh of the Maryland Circuit Court for Montgomery County upheld a Maryland Motor Vehicle Administration administrative finding that, inter alia, a fifteen-day cancellation notice was proper.  In Annapolis Motors, a Volvo automobile dealership franchise was terminated because the dealer had "breached its agreement with Volvo as to financial reporting, floor plan financing, and automobile inventory requirements." (Id. at 13,152.)  On these facts, the court upheld the administrative finding that the fifteen-day notice period was appropriate because the dealer was "unable to serve the best interests of the public . . . ."  (Id.)  Similarly, in Fred Menke's Car Store, Inc. v. Volvo North America Corp., 698 F. Supp. 1287, 1296 (D. Md. 1987), Judge Harvey found that a Volvo automobile dealership could be terminated on fifteen days notice because of "inadequate parts and service facilities" that would "clearly impair the [dealer's] ability to serve its customers in the manner contemplated by the dealership agreement."  (Id.)

_____

[8] Section 15-209(d)(1) was formerly codified at § 15-209(b)(1).

42

VTNA argues that Hale Trucks was unable to serve the
interests of the public because it had no inventory of new Volvo
trucks on its lot, since they had all been repossessed by VCF.
(VTNA Mot. for Summ. J. at 36.)  Hale Trucks argues that it
remained able to serve the interests of the public because it was
still able to conduct "fleet sales."  (Hale Opp. to VTNA Mot. for
Summ. J. at 30-31.)  It states, without citation to any record
evidence, that "[f]leet owners do not purchase trucks from a lot.
Fleet salesmen use catalogues."  (Id. at 30)  It argues further
that, "[t]here is often a significant length of time between an
order and delivery, with deliveries stretching out as far as a
year.  The temporary loss of floor plan financing, even for as
much as sixty days, has little effect on these type of sales."
(Id. at 31.)

This court concludes that a truck dealership without new
trucks in inventory, where the Dealer Agreement requires new
inventory be kept on the lot, and where the dealer has lost the
financing required to obtain new inventory, is unable to serve
the public interest as a matter of law.  As Judge Harvey
recognized in Fred Menke's Car Store, the concept of the "public
interest" does not exist in a vacuum.  Instead, whether a
dealership can serve the public interest depends upon whether it
can "serve its customers in the manner contemplated by the dealer
agreement."   Fred Menke's Car Store, 698 F. Supp. at 1296.

43

Here, Hale Trucks may have been able to continue to serve a
subsection of the public: fleet owners. The Dealer Agreement,
however, contemplated serving non-fleet buyers by requiring that
Hale Trucks at all times maintain an inventory of at least eight
unsold new Volvo trucks. (VTNA Mot. for Summ. J., Ex. 1 at
T01437.) Because the "public interest" was not served in a
manner required by the Dealer Agreement, under § 15-209(d)(1)
VTNA was entitled to terminate the Dealer Agreement on fifteen
days notice. Summary judgment on Count IX will therefore be
granted.

### b.   **Section 15-207**

Hale Trucks alleges that VTNA's offer to assist in a
recapitalization plan it developed for Hale Trucks constituted
unlawful coercion under § 15-207. MD. CODE ANN., Transp. II, §
15-207 (2000). Presumably Hale Trucks is bringing its claim
under § 15-207(b), which states that "[a] manufacturer,
distributor, or factory branch, whether directly or through an
agent, employee, or representative, may not coerce any dealer to
make any agreement with the manufacturer, distributor, or factory
branch." "Coerce" is defined in § 15-207(a)(2)(i) as meaning "to
compel or attempt to compel by threat of harm, breach of
contract, or other adverse consequences." The definition of
"'[c]oerce' does not include to argue, urge, recommend, or

44

persuade." § 15-207(a)(2)(ii). The meaning of the term "coerce" under the Maryland law is comparable to the interpretation of "coerce" as used in the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, et seq. ("ADDCA"). See Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc., 699 A.2d 1209, 1219 (Md.App. 1997); Colonial Dodge, Inc. v. Chrysler Corp., 11 F. Supp. 2d 737, 744 (D. Md. 1996); see also Wootton Enters., Inc. v. Subaru of America, Inc., 134 F. Supp.2d 698, 718 n.20 (D. Md. 2001). In order for there to be wrongful "coercion" under the ADDCA, "'the dealer must demonstrate that the manufacturer exercised coercion or intimidation or made threats against the dealer . . . to achieve an improper or wrongful objective.'" Antwerpen Dodge, 699 A.2d at 1219 n.9 (quoting Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp., 814 F.2d 90, 95 (2d Cir. 1987)(internal citation omitted)). "'[M]ore is required than coercion and subsequent termination for failure to submit, for otherwise the manufacturer would be precluded from insisting upon reasonable and valid contractual provisions.'" Id. (quoting Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 561 (2d Cir. 1970)).

Hale Trucks alleges that it was "coerced" by VTNA's offer that it would invest at least $1.2 million if Hale Trucks were to give up its Peterbilt franchise. (Hale Trucks Surreply at 9-10.) The facts indicate that by the time the offer was made, Hale Trucks was already in default of its floor plan agreement with

45

VCF, and VTNA was already aware of Hale Trucks' serious financial difficulties, including deficiencies in working capital.[9]  (See VTNA Mot. for Summ. J., Ex. 41, Ex. 30 at T00149-51.)  Therefore, VTNA could have rightfully terminated Hale Trucks as a dealer even before the recapitalization offer was made.

In its pleadings, Hale Trucks argues that "adverse consequences" were "implied" if it were to refuse VTNA's recapitalization offer.  (Hale Trucks Surreply at 9.)  Hale Trucks seems to suggest that its ultimate termination by VTNA was the realization of those "adverse consequences."  This claim fails on several points.  First, as an evidentiary matter, Hale Trucks does not identify any "harm, breach of contract, or other adverse consequences" that VTNA may have wrongfully threatened.  See § 15-207(a)(2)(i).  Because VTNA was within its rights to terminate Hale Trucks, due to its breaches of the Dealer Agreement, a threat to so terminate could not have been wrongful.  Hale Trucks also points to VTNA's forwarding to VCF the possibly false information from Edward Brown about the $200,000 insufficient funds check as evidence that VTNA punished it for not accepting the recapitalization offer.  (Hale Trucks Surreply at 9-10.)  This argument is unpersuasive, however, since even if

_____

[9] According to the terms of the Dealer Agreement, VTNA presumably could have sent notice to terminate the Dealer Agreement as early as February 16, 2000, the date upon which VTNA learned of the severity of Hale Trucks' financial difficulties. (See Id., Ex. 9 at T00074-75, Ex. 30.)

46

the information provided by Edward Brown was false, there is no evidence that VTNA was aware of its falsity.

The record is persuasive that VTNA's recapitalization offer was an attempt by VTNA to save a failing dealership, not an attempt to coerce Hale Trucks into accepting unreasonable terms. That VTNA would attach strings to the offer, such as requiring the termination of the Peterbilt franchise, is unremarkable. Were VTNA to invest significant sums in Hale Trucks, it is reasonable that VTNA would have wanted Hale Trucks to become an exclusive Volvo dealer. Ultimately, however, Hale Trucks rejected the recapitalization offer, and both sides were left where they were before the offer was made.

For the reasons set forth above, summary judgment on Count X will be granted.

## B. **Counterclaims Against Edwin Hale, Sr. and Hale Trucks**

VTNA has brought a four-part counterclaim against Edwin Hale, Sr. and Hale Trucks. Counts I and II involve alleged breaches of contract by Hale Trucks, and Hale Trucks has not moved for summary judgment on these Counts. Count III alleges intentional misrepresentation, and Count IV alleges negligent misrepresentation, both against Edwin Hale, Sr. and Hale Trucks. VTNA has moved for summary judgment on Count III, and Edwin Hale, Sr. has cross-moved on Count III and has moved for summary

47

judgment on Count IV. For the reasons set forth below, judgment as a matter of law is granted in favor of Edwin Hale, Sr. and Hale Trucks on both Counts III and IV.

VTNA argues that, in the Portfolio Edwin Hale, Sr. executed prior to the execution of the Dealer Agreement, he promised to invest \$769,555 into Hale Trucks. (See VTNA Mot. for Summ. J., Ex. 1 at T01431.) According to VTNA "[h]e did not do so, and the evidence is clear that his misrepresentation was, at the least, negligently made." (Id. at 44.) Edwin Hale, Sr. argues that VTNA did not rely on any of his representations, that he made no misrepresentations, that VTNA's loss was not proximately caused by a failure to capitalize Hale Trucks, and that there is no "clear and convincing evidence" of scienter on his part. (Hale Counter Motion at 9-15.)

The Court of Appeals of Maryland has outlined the elements of negligent misrepresentation as follows:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Martens Chevrolet, Inc. v. Seney, 439 A.2d 534, 539 (Md. 1982). Similarly, to prove intentional misrepresentation, which is

48

called fraud or deceit in Maryland, the plaintiff must prove:

(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

Alleco, 665 A.2d at 1047-48 (citations omitted).

These claims fail as a matter of law because VTNA has failed to allege that Hale made any "misrepresentation," either negligently or intentionally. Rather, Hale made a promise, which is the domain of contract, and made no statement about a past or present fact. As it was explained in Alleco:

Ordinarily fraud cannot be predicated on statements which are promissory in their nature, and therefore an action for deceit will not lie for the unfulfillment of promises or the failure of future events to materialize as predicted. Failure to fill a promise is merely a breach of contract, which must be enforced, if at all, by an action ex contractu.

Alleco, 665 A.2d at 1048 (quoting Appel v. Hupfield, 84 A.2d 94, 96 (Md. 1951)). Similarly, in Ward Development Co., Inc. v. Ingrao, the Court of Special Appeals noted that for a "plaintiff justifiably to take action in reliance on a statement, that statement must be a representation of a material fact." 493 A.2d 421, 426 (Md.App. 1984)(emphasis added). In this case, Hale made a promise that he would invest a certain amount of money into the

49

dealership.[10]  A remedy for this type of broken promise is
provided by the law of contract.

As recognized in Alleco, a deliberate misrepresentation of
one's existing intentions, where the misrepresentation is
material, "may form the basis for an action in fraud or deceit."
Alleco, 665 A.2d at 1048 (citing cases).  In this case, however,
despite counter-plaintiff's suspicions that Edwin Hale, Sr. never
intended to invest the requisite funds, VTNA has proffered no
evidence to support this suspicion.  Because intent is an element
of fraud, VTNA cannot survive summary judgment without presenting
some evidence that Edwin Hale, Sr. had no intent to invest the
required amount at the time he signed the Portfolio.[11]

_____

[10] The Court of Appeals has recognized causes of actions for
negligent misrepresentation against those "knowledgeable in a
particular field" where "circumstances indicate to the addressee
that the speaker has a factual basis for his predictions so that
the existence of facts is implied by the representations."  Ward
Development, 493 A.2d at 427 (citation omitted).  In Ward,
plaintiff alleged a cognizable cause of action against the
developer of a housing subdivision and his agent who had made
predictions about the cost of sewer hookups.  Because defendants
had "held themselves out as knowledgeable" in the field of real
estate, they could be held liable for misrepresenting those
charges.  Id.; see also Brock Bridge Ltd. P'ship, Inc. v.
Development Facilitators, Inc., 689 A.2d 622, 630-34 (Md.App.
1995)(professional engineer may be held liable for negligently
misrepresenting cost of completing construction project).  This
situation, however, is factually inapposite to the current case.

[11] This same analysis applies to the counterclaim against
Hale Trucks.  Because the Dealer Agreement incorporated by
reference and superseded the Portfolio, Hale Trucks may be
thought to have made the same representations as did Hale.  Yet
the failure of evidence applies equally to the claims against
Edwin Hale, Sr. and those against Hale Trucks.

For these reasons, summary judgment will be granted in favor of Hale on Counts III and IV of the counterclaim. Because of the commonality between the factual and legal issues pertaining to the counterclaims against Edwin Hale, Sr. and Hale Trucks, summary judgment also will be granted in favor of Hale Trucks on Counts III and IV of the counterclaim.

A separate order follows.


_September 11, 2002_

Date

_Catherine C. Blake_

Catherine C. Blake
United States District Judge


51